[No. 9009.   Department Two.   April 5, 1911.]

JAMES SPACKMAN *et al., Appellants,* v. CHARLES F. WEBB
*et al., Respondents,* THE STATE OF WASHINGTON,
*Intervener and Appellant.*[1]

DEEDS— VALIDITY — MENTAL CAPACITY — EVIDENCE — SUFFICIENCY.
Deeds and a bill of sale disposing of all the grantor's property during
his last illness, and in view of approaching death, will not be set
aside at the suit of persons as to whom there was no more than a
bare possibility of heirship, and there was only the most meager
testimony of mental incapacity on the part of the grantor, consisting
principally of statements attributed to the physician that he was in
a "dying condition," witnesses testified to his competency, and the
witnesses to the deed were not called.

ESCHEAT—WANT OF HEIRS—EVIDENCE — SUFFICIENCY.   The state
cannot claim an escheat merely because parties failed to show that
they were heirs of the deceased.

Appeal from a judgment of the superior court for Oka-
nogan county, Taylor, J., entered February 11, 1910, upon
findings in favor of the defendants, after a trial on the merits
before the court without a jury, in an action for cancellation.
Affirmed.

*Frank H. Foster, G. W. Sampson,* and *P. D. Smith,* for
appellants.

*G. V. Alexander* and *W. E. Grant,* for respondents.

*W. P. Bell, Attorney General,* for intervener.

[1]Reported in 114 Pac. 877.

CHADWICK, J.—More than twenty years ago, John Speckman went to what is now Okanogan county, and settled on a tract of land about six miles from the present town of Loomis. Later, when the land was surveyed, he made formal filing, and thereafter secured a patent. His life in the community differed in no degree from that of the ordinary American pioneer. He raised a few cattle and cultivated some ground for hay and garden. At one time he had a mail contract, and carried the mail on one of the star routes then, and perhaps now, serving the isolated settlements. When filing upon his land, he gave his name as John Speckman. He claimed that he was a citizen of the United States, born in Pennsylvania. He signed his mail contract in the same way, and so far as the record shows, did all his business and signed such documents as became incident to his limited range of business activity, in the same way. Mr. Speckman was a man of ordinary intelligence, but slow and close of speech. He was not given to confidences, and was extremely reticent, if not wholly disinclined to speak of his past or of his family. A few witnesses testified to such disclosures, but in almost all of such instances such information as he volunteered was in answer to direct questions put by others. From these disconnected statements, it appears that Speckman was brought up in Pennsylvania, where as a boy he was employed in the coal mines; that he was familiar with at least one or two of the cities and towns in Pennsylvania; that he probably went to sea for a time, and was in the state of Arkansas for a season; that he had worked on railroads, including the Canadian Pacific, from which he had drifted into Okanogan county.

The testimony further shows that he had some knowledge of, and was able to converse in, the dialect known as Pennsylvania Dutch. In Speckman's later years he was afflicted with heart disease, and about April 6, 1906, went to a hospital conducted by respondents Webb, at Loomis, for treatment. He died June 20, 1906. A few days before his

death, he disposed of his property, amounting in value to four or five thousand dollars. He deeded his ranch and made over his personal property to Dr. Webb, after giving some of his stock to one Gibson and some to Mrs. Farrens, who says she was engaged to marry Speckman. He died without known heirs, and several witnesses were produced who testified that he had frequently said that he had no "folks" that he. knew of. Two or three witnesses testified that, when apparently mindful of his broken health, he had spoken to them about making over his property to some one who would give him a good home and care for him during the remainder of his life. One of these witnesses was asked whether he thought Dr. Webb was a proper person to receive such donation, and to another he said that he was going to or had made his property over to Dr. Webb.

After his death, the appellants appeared, claiming that one Robert Spackman, a cooper by trade, had emigrated from England and settled in Canada, having, among other children, two sons, Lorenzo and Alfred John. Lorenzo, after a time spent in one of the eastern states, settled in Dayton, Washington, and Alfred John, who it is claimed was known as John and was considered the black sheep of the family, ran away from home when a boy. One Schull, a freighter, who had formerly lived at Dayton and seems to have borne some relationship to Lorenzo Spackman's family, met Speckman in the year 1903. He says he was struck by the similarity of the name, and what he claims to be a strong resemblance to Lorenzo Spackman, and that he wrote to his friends at Dayton of the fact that Speckman might be the lost brother Alfred John.

It is likely that Lorenzo Spackman wrote to John Speckman, but the evidence is more certain that, if he did so, the letter was never answered. Schull admits that John Speckman did not admit the relationship, nor did Lorenzo Spackman ever go to see him or pursue the inquiry further. Mrs. Farrens swears that Speckman told her he was born in

Canada, and could find his relations if he wanted to; and the witness Gibson says Speckman had said his father was a cooper. It is also claimed that Alfred John Spackman had his shoulder broken when a boy, and there is some slight evidence to show that Speckman had spoken of a broken collar bone, an injury received when a boy. The testimony of appellants shows that the injury was promptly treated by a surgeon, while the testimony relied on to confirm this incident shows that Speckman stated that he was working for an uncle and, being fearful of his wrath, did not discover the injury to him, but allowed the hurt to heal without salve or physic. A photograph of Lorenzo Spackman, now deceased, was introduced, and some one or two witnesses claimed to detect a similarity or resemblance between Lorenzo Spackman and John Speckman. A letter was submitted to a witness who claimed to be an expert in handwriting, who compared it with the admitted writing of John Speckman, and expressed the opinion that the letter was probably written by John Speckman. We cannot weigh the evidence, so far as it depends upon photographs and exhibits, inasmuch as they are not made a part of the record. Upon these main facts, and others of less weight, the claim of appellants to the heirship of John Speckman rests.

It is contended that the instruments conveying the property to respondents should be set aside, as having been taken at a time when John Speckman was incompetent by reason of his sickness and approaching dissolution, and in fraud of the rights of appellants. After the testimony had been taken, the state intervened, claiming that the evidence shows that John Speckman died without heirs, and joined in the prayer of the respondents that the conveyances to Dr. Webb be set aside, and further that the property be escheated to the common school fund. From a decree denying appellants' heirship and affirming and upholding the conveyances to Dr. Webb, this appeal is taken. The state also appeals from the refusal of the court to set aside the deed and bill

of sale of the personal property, and its refusal to find that John Speckman died without heirs.

In our judgment the weight of evidence sustains the decree. No more than a bare possibility of heirship was shown by the appellants, and the testimony relied upon to show mental incapacity on the part of the grantor is of a most meager character, consisting principally of statements attributed to Dr. Webb that Speckman had been "dying for a week"; that he had "kept him alive the last three or four days with drugs." But there is no evidence even tending to show that he was unconscious more than twenty-four hours before his death, while the notary who took his acknowledgment testified that he was in full possession of his faculties so far as he could see. Both Mrs. Farrens and Gibson agree that he was competent when he made over property to them. Nor does it appear that the witnesses to the deed were even called to testify as to his condition. From the whole record we are convinced that John Speckman was, at the time he conveyed his property to Dr. Webb, mindful of his purpose, and while sick unto death, was mentally competent to understand the nature and character of his act.

It does not follow that, because the appellants have failed to show that they are the heirs of Speckman, he died without heirs; or if he did, being competent to dispose of his property in his lifetime, the state has no ground upon which to claim escheat. No one now before the court having shown an interest in the property of John Speckman sufficient to challenge his disposition of his property, the decree of the lower court will be affirmed.

Many cases have been cited tending to sustain the theories of the respective parties. A review of these cases would be useless, in the light of our finding that neither appellants nor the state has demonstrated an interest sufficient to maintain an action, and that John Speckman was *sui juris* at the time of the execution of the deed and bills of sale which appellants and the intervener seek to set aside. We have stated the

case in passing perhaps more strongly than a strict construction of the testimony would warrant, and to some extent have said what we assume the exhibits and depositions would show if they were before us; and while à motion was interposed before the hearing of this case, asking that the appeal be dismissed because of the insufficiency of the record, we have felt, because of its unusual interest, it would be better to dispose of the case on the merits.

Affirmed.

DUNBAR, C. J., MORRIS, and CROW, JJ., concur.